(Slip Opinion)                OCTOBER  TERM,  2007                1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DEPARTMENT OF REVENUE OF KENTUCKY ET AL. *v.* DAVIS ET UX.

### CERTIORARI TO THE COURT OF APPEALS OF KENTUCKY

No. 06–666.   Argued November 5, 2007—Decided May 19, 2008

Kentucky exempts from state income taxes interest on bonds issued by it or its political subdivisions but not on bonds issued by other States and their subdivisions.  After paying state income tax on out-of-state municipal bonds, respondents sued petitioners (hereinafter Kentucky) for a refund, claiming that Kentucky's differential tax impermissibly discriminated against interstate commerce.  The trial court ruled for Kentucky, relying in part on a "market-participation" exception to the dormant Commerce Clause limit on state regulation.  The State Court of Appeals reversed, finding that Kentucky's scheme ran afoul of the Commerce Clause.

*Held:* The judgment is reversed, and the case is remanded.

197 S. W. 3d 557, reversed and remanded.

JUSTICE SOUTER delivered the opinion of the Court, except as to Part III–B, concluding that Kentucky's differential tax scheme does not offend the Commerce Clause.  Pp. 7–13, 20–28.

  (a) Modern dormant Commerce Clause law is driven by concern about "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors," *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 273–274—but that concern is limited by federalism favoring a degree of local autonomy.  Under the resulting analysis, a discriminatory law is "virtually *per se* invalid." *Oregon Waste Systems, Inc.* v. *Department of Environmental Quality of Ore.*, 511 U. S. 93, 99.  An exception covers States that go beyond regulation and themselves "participat[e] in the market" to "exercis[e] the right to favor [their] own citizens over others," *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794, 810, reflecting a "basic distinction . . . between States as market

participants and States as market regulators," *Reeves, Inc.* v. *Stake*, 447 U. S. 429, 436. Last Term, in a case decided independently of the market participant exception, this Court upheld an ordinance requiring trash haulers to deliver solid waste to a public authority's processing plant, finding that it addressed what was "'both typically and traditionally a local government function,'" and did "not discriminate against interstate commerce for purposes of the dormant Commerce Clause," *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U. S. ___, ___. Pp. 7–10.

  (b) *United Haulers* provides a firm basis for reversal here. The logic that a government function is not susceptible to standard dormant Commerce Clause scrutiny because it is likely motivated by legitimate objectives distinct from simple economic protectionism applies with even greater force to laws favoring a State's municipal bonds, since issuing debt securities to pay for public projects is a quintessentially public function, with a venerable history. Bond proceeds are a way to shoulder the cardinal civic responsibilities listed in *United Haulers:* protecting citizens' health, safety, and welfare. And *United Haulers'* apprehension about "unprecedented . . . interference" with a traditional government function is warranted here, where respondents would have this Court invalidate a century-old taxing practice presently employed by 41 States and supported by all. In fact, emphasizing an enterprise's public character is just one step in addressing the fundamental element of dormant Commerce Clause jurisprudence that "any notion of discrimination assumes a comparison of substantially similar entities," *id.,* at ___. Viewed through the lens of *Bonaparte* v. *Tax Court*, 104 U. S. 592, there is no forbidden discrimination because Kentucky, as a public entity, does not have to treat itself as being "substantially similar" to other bond issuers in the market. Pp. 11–13.

  (c) A look at the specific markets in which the exemption's effects are felt confirms that no traditionally forbidden discrimination is underway and points to the tax policy's distinctive character. In both the interstate market as most broadly conceived—issuers and holders of all fixed-income securities—and the more specialized market—commerce solely in federally tax-exempt municipal bonds, often conducted through interstate municipal bond funds—nearly every taxing State believes its public interests are served by the same tax-and-exemption feature which is supported in this Court by every State. These facts suggest that no State perceives any local advantage or disadvantage beyond the permissible ones open to a government and to those who deal with that government when it enters the market. An equally significant perception emerges from examining the market for municipal bonds within the issuing State, a large proportion

Syllabus

of which market is managed by one or more single-state funds. An important feature of such markets is that intrastate funds absorb securities issued by smaller or lesser known municipalities that interstate markets tend to ignore. Many single-state funds would likely disappear if the current differential tax schemes were upset, and there is no suggestion that the interstate markets would welcome the weaker municipal issues that would lose their local market homes after a Davis victory. Financing for long-term municipal improvements would thus change radically if the differential tax feature disappeared. The fact that the differential tax scheme is critical to the operation of an identifiable segment of the current municipal financial market demonstrates that the States' unanimous desire to preserve the scheme is a far cry from the private protectionism that has driven the dormant Commerce Clause's development. Pp. 20–23.

　(e) The Court generally applies the rule in *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142, that even nondiscriminatory burdens on commerce may be struck down on a showing that they clearly outweigh the benefits of a state or local practice. But the current record and scholarly material show that the Judicial Branch is not institutionally suited to draw reliable conclusions of the kind that would be necessary for the Davises to satisfy a *Pike* burden in this particular case. Pp. 23–27.

　SOUTER, J., announced the judgment of the Court and delivered the opinion of the Court, except as to Part III–B. STEVENS and BREYER, JJ., joined that opinion in full; ROBERTS, C. J., and GINSBURG, J., joined all but Part III–B; and SCALIA, J., joined all but Parts III–B and IV. STEVENS, J., filed a concurring opinion. ROBERTS, C. J., and SCALIA, J., filed opinions concurring in part. THOMAS, J., filed an opinion concurring in the judgment. KENNEDY, J., filed a dissenting opinion, in which ALITO, J., joined. ALITO, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 06–666

———————

## DEPARTMENT OF REVENUE OF KENTUCKY, ET AL., PETITIONERS *v.* GEORGE W. DAVIS ET UX.

### ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF KENTUCKY

[May 19, 2008]

JUSTICE SOUTER delivered the opinion of the Court, except as to Part III–B.\*

For the better part of two centuries States and their political subdivisions have issued bonds for public purposes, and for nearly half that time some States have exempted interest on their own bonds from their state income taxes, which are imposed on bond interest from other States. The question here is whether Kentucky's version of this differential tax scheme offends the Commerce Clause. We hold that it does not.

## I

### A

Like most other States, the Commonwealth of Kentucky taxes its residents' income. See Ky. Rev. Stat. Ann. §141.020(1) (West 2006). The tax is assessed on "net income," see *ibid.*, calculated by reference to "gross income" as defined by the Internal Revenue Code, see §§141.010(9)–(11) (West Supp. 2007),[1] which excludes

———————

\*JUSTICE GINSBURG joins all but Part III–B of this opinion.

[1] Specifically, Kentucky defines "net income" for noncorporate tax-

"interest on any State or local bond" ("municipal bond," for short[2]), 26 U. S. C. §103(a).  Kentucky piggybacks on this exclusion, but only up to a point: it adds "interest income derived from obligations of sister states and political subdivisions thereof" back into the taxable net.  Ky. Rev. Stat. Ann. §141.010(10)(c).  Interest on bonds issued by Kentucky and its political subdivisions is thus entirely exempt,[3] whereas interest on municipal bonds of other States and their subdivisions is taxable.  (Interest on bonds issued by private entities is taxed by Kentucky

———————

payers as "adjusted gross income," minus certain deductions.  See Ky. Rev. Stat. Ann. §141.010(11).  "Adjusted gross income," in turn, is defined as "gross income" minus other deductions spelled out in the Internal Revenue Code and elsewhere in the Kentucky statutes.  See §141.010(10).  Finally, "gross income" has the same meaning set out in §61 of the Internal Revenue Code.  See §141.010(9); see also 26 U. S. C. §61.

[2] "Municipal bond" is commonly defined as a "debt obligation of a state or local government entity."  J. Downes & J. Goodman, Dictionary of Finance and Investment Terms 439 (7th ed. 2006).  We use that definition here; our references to "municipal bonds" thus include bonds issued by States and their political subdivisions.

An argument raised by one of the Davises' *amici* focuses on so-called "private-activity," "industrial-revenue," or "conduit" bonds, a subset of municipal bonds used to finance projects by private entities.  These bonds are often (but not always) exempt under the Kentucky scheme. *Amici* contend that Kentucky's exemption of these bonds, at the very least, plainly violates the Commerce Clause.  See Brief for Alan D. Viard et al. as *Amici Curiae* 25–26.  This argument, however, was not considered below, was never pressed by the Davises themselves, and is barely developed by *amici*.  Moreover, we cannot tell with certainty what the consequences would be of holding that Kentucky violates the Commerce Clause by exempting such bonds; we must assume that it could disrupt important projects that the States have deemed to have public purposes.  Accordingly, it is best to set this argument aside and leave for another day any claim that differential treatment of interest on private-activity bonds should be evaluated differently from the treatment of municipal bond interest generally.

[3] There are some exceptions which derive from the federal exclusion, see 26 U. S. C. §103(b), but they do not matter here.

regardless of the private issuer's home.)

The ostensible reason for this regime is the attractive-ness of tax-exempt bonds at "lower rates of interest . . . than that paid on taxable . . . bonds of comparable risk." M. Graetz & D. Schenk, Federal Income Taxation 215 (5th ed. 2005) (hereinafter Graetz & Schenk). Under the Internal Revenue Code, for example, see 26 U. S. C. §103, "if the market rate of interest is 10 percent on a comparable corporate bond, a municipality could pay only 6.5 percent on its debt and a purchaser in a 35 percent marginal tax bracket would be indifferent between the municipal and the corporate bond, since the after-tax interest rate on the corporate bond is 6.5 percent," Graetz & Schenk 215.[4] The differential tax scheme in Kentucky works the same way; the Commonwealth's tax benefit to residents who buy its bonds makes lower interest rates acceptable,[5] while limiting the exception to Kentucky bonds raises in-state demand for them without also subsidizing other issuers.

The significance of the scheme is immense. Between 1996 and 2002, Kentucky and its subdivisions issued $7.7 billion in long-term bonds to pay for spending on transportation, public safety, education, utilities, and environmental protection, among other things. IRS, Statistics of

_____

[4] The amount of this benefit to municipal issuers can be approximated by comparing the interest rates on municipal bonds to those on Treasury bonds, which are also exempt from state taxation but are subject to federal taxation. "[A]t the end of 2006, the borrowing costs on AAA-rated, 10-year municipal bonds on average were 80.3 percent of comparable, but federally taxable, U. S. Treasury securities, [and] at the end of 2005 the borrowing costs on such municipal bonds were 88.4 percent of comparable U. S. Treasury bonds." Brief for National Federation of Municipal Analysts as *Amicus Curiae* 8, n. 4.

[5] The precise reduction in interest rates depends on the federal and state income tax rates, the credit rating of the issuer, the term of the bond, and market factors. See *id.,* at 8. The reduction in interest rates is generally greater the higher are a State's income tax rates. See *id.,* at 9, and n. 6.

Income Bulletin, C. Belmonte, Tax-Exempt Bonds, 1996–
2002, pp. 169–170, http://www.irs.gov/pub/irs-soi/02gov
bnd.pdf (as visited Jan. 23, 2008, and available in Clerk of
Court's case file). Across the Nation during the same
period, States issued over $750 billion in long-term bonds,
with nearly a third of the money going to education, fol-
lowed by transportation (13%) and utilities (11%). See
*ibid.* Municipal bonds currently finance roughly two-
thirds of capital expenditures by state and local govern-
ments. L. Thomas, Money, Banking and Financial Mar-
kets 55 (2006).

Funding the work of government this way follows a
tradition going back as far as the 17th century. See C.
Johnson & M. Rubin, The Municipal Bond Market: Struc-
ture and Changes, in Handbook of Public Finance 483, 485
(F. Thompson & M. Green eds. 1998) ("[In] 1690 . . . Mas-
sachusetts issued bills of credit to pay soldiers who had
participated in an unsuccessful raid on the City of Que-
bec"). Municipal bonds first appeared in the United States
in the early 19th century: "New York City began to float
[debt] securities in about 1812," A. Hillhouse, Municipal
Bonds: A Century of Experience 31 (1936) (hereinafter
Hillhouse), and by 1822 Boston "had a bonded debt of
$100,000," *id.,* at 32. The municipal bond market had
swelled by the mid-1840s, when the aggregate debt of
American cities exceeded $27 million, and the total debt of
the States was nearly 10 times that amount. See *ibid.*
Bonds funded some of the great public works of the day,
including New York City's first water system, see *id.*, at
31, and the Erie Canal, see R. Amdursky & C. Gillette,
Municipal Debt Finance Law §1.2.1, p. 15 (1992) (herein-
after Amdursky & Gillette). At the turn of the 20th cen-
tury, the total state and municipal debt was closing in on
$2 billion, see Hillhouse 35, and by the turn of the millen-
nium, over "$1.5 trillion in municipal bonds were out-
standing," J. Temel, The Fundamentals of Municipal

Bonds, p. ix (5th ed. 2001).

Differential tax schemes like Kentucky's have a long pedigree, too. State income taxation became widespread in the early 20th century, see A. Comstock, State Taxation of Personal Incomes 11 (1921) (reprinted 2005) (hereinafter Comstock), and along with the new tax regimes came exemptions and deductions, see *id.,* at 171–184, to induce all sorts of economic behavior, including lending to state and local governments at favorable rates of untaxed interest. New York enacted the first of these statutes in 1919, see 1919 N. Y. Laws pp. 1641–1642, the same year it imposed an income tax, see Comstock 104,[6] and other States followed, see, *e.g.,* 1921 N. C. Sess. Laws p. 208; 1923 N. H. Laws p. 78; 1926 Va. Acts ch. 576, pp. 960–961, with Kentucky joining the pack in 1936, see 1936 Ky. Acts p. 71. Today, 41 States have laws like the one before us.[7]

---

[6] The Federal Government got in the game even earlier. Municipal bonds were exempted from "every federal income tax act enacted since passage of the Sixteenth Amendment" in 1913. Amdursky & Gillette §7.2.1, at 440.

[7] This figure includes Kentucky and 36 other States that have schemes that are nearly identical to Kentucky's. See Ala. Code §§40–18–4, 40–18–14(3)(f) (2003); Ariz. Rev. Stat. Ann. §43–1021(3) (West Supp. 2007); Ark. Code Ann. §26–51–404(b)(5) (Supp. 2007); Cal. Rev. & Tax. Code Ann. §17133 (West 2004); Colo. Rev. Stat. Ann. §39–22–104(3)(b) (2007); Conn. Gen. Stat. §12–701(a)(20)(A)(i) (2007); Del. Code Ann., Tit. 30, §1106(a)(1) (1997); Ga. Code Ann. §48–7–27(b)(1)(A) (2005); Haw. Rev. Stat. §§39–11, 47–13 (1994), 235–7(a)(6), (b)(2) (2001); Idaho Code §§63–3022M(1), (3)(b) (Lexis 2007); Kan. Stat. Ann. §79–32,117(b)(i) (2006 Cum. Supp.); La. Stat. Ann. §§47:48, 47:293(9)(a), (b) (West 2001 and Supp. 2008); Me. Rev. Stat. Ann., Tit. 36, §5122(1)(A) (Supp. 2007); Md. Tax-Gen. Code Ann. §10–204(b) (Lexis Supp. 2007); Mass. Gen. Laws, ch. 62, §2(a)(1)(A) (West 2006); Mich. Comp. Laws Ann. §206.30(1)(a) (West Supp. 2007); Minn. Stat. §290.01, subd. 19a(1)(i) (2006); Miss. Code Ann. §27–7–15(4)(d) (Supp. 2007); Mo. Rev. Stat. §143.121(2)(b) (2007 Supp.); Mont. Code Ann. §15–30–111(2)(a)(i) (2007); Neb. Rev. Stat. §77–2716(1)(c) (2007 Supp.); N. H. Rev. Stat. Ann. §77:4(I) (Supp. 2007); N. J. Stat. Ann. §54A:6–14 (West 2002); N. M. Stat. Ann. §§7–2–2(B)(3), (V) (2005); N. Y. Tax Law

B

Petitioners (for brevity, Kentucky or the Common-wealth) collect the Kentucky income tax. Respondents George and Catherine Davis are Kentucky residents who paid state income tax on interest from out-of-state municipal bonds, and then sued the tax collectors in state court on a refund claim that Kentucky's differential taxation of municipal bond income impermissibly discriminates against interstate commerce in violation of the Commerce Clause of the National Constitution. The trial court granted judgment to the Commonwealth, relying in part on our cases recognizing the "market-participant" exception to the dormant Commerce Clause limit on state regulation. See App. to Pet. for Cert. A18–A19 (citing *Reeves, Inc.* v. *Stake*, 447 U. S. 429 (1980), and *Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794 (1976)).

The Court of Appeals of Kentucky reversed. See 197 S. W. 3d 557 (2006). In a brief discussion, it rejected the reasoning of an Ohio case upholding a similar tax scheme challenged under the Commerce Clause, see *id.,* at 563

---

Ann. §612(b)(1) (West 2006); N. C. Gen. Stat. Ann. §§105–134.6(b)(1)(b), (c)(1) (Lexis 2005); N. D. Cent. Code Ann. §57–38–01.2(1)(g) (Lexis Supp. 2007); Ohio Rev. Code Ann. §5747.01(A)(1) (Lexis Supp. 2007); Ore. Rev. Stat. §316.680(2)(a) (2003); Pa. Stat. Ann., Tit. 72, §9901 (Purdon 2000); R. I. Gen. Laws §44–30–12(b)(1) (Supp. 2007); S. C. Code Ann. §12–6–1120(1) (2000); Tenn. Code Ann. §67–2–104(e)(1) (2006); Vt. Stat. Ann., Tit. 32, §5811(18)(A)(i)(II) (2007); Va. Code Ann. §§58.1–322(B)(1), (C)(2) (Lexis Supp. 2007); W. Va. Code Ann. §§11–21–12(b)(1), (c)(2) (Lexis Supp. 2007). It also includes four States that tax out-of-state municipal bonds and exempt some, but not all, in-state municipal bonds. See Iowa Code §422.7(36) (2005); Okla. Stat., Tit. 68, §§2358.5, 2358.5A (West 2007 Supp.); Wis. Stat. §71.05(1)(c) (2003–2004); compare Ill. Comp. Stat., ch. 35, §5/203(a)(2)(A) (West 2006) with ch. 45, §35/80(e). Of the remaining States, Utah exempts its own bonds, and extends reciprocal treatment to the bonds of States that do not tax Utah bonds, see Utah Code Ann. §§59–10–114(1)(g), (6) (Lexis 2007 Supp.); Indiana exempts all municipal bonds, see Ind. Code §6–3–1–3.5 (West 2004); and the balance have no personal income tax.

(discussing *Shaper* v. *Tracy*, 97 Ohio App. 3d 750, 647 N. E. 2d 550 (1994)), and distinguished our market participant cases, see 197 S. W. 3d, at 564, as well as a decision from the 19th century the Commonwealth relied on, see *id.,* at 563–564 (discussing *Bonaparte* v. *Tax Court*, 104 U. S. 592 (1882)).  The Court of Appeals thought it had "no choice but to find that Kentucky's system of taxing only extraterritorial bonds runs afoul of the Commerce Clause," 197 S. W. 3d, at 564, and the Supreme Court of Kentucky denied the Commonwealth's motion for discretionary review, see App. to Pet. for Cert. A14.

We granted certiorari owing to the conflict this raised on an important question of constitutional law, and because the result reached casts constitutional doubt on a tax regime adopted by a majority of the States.  550 U. S. \_\_\_ (2007).  We now reverse.

## II

The Commerce Clause empowers Congress "[t]o regulate Commerce . . . among the several States," Art. I, §8, cl. 3, and although its terms do not expressly restrain "the several States" in any way, we have sensed a negative implication in the provision since the early days, see, *e.g., Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299, 318–319 (1852); cf. *Gibbons* v. *Ogden*, 9 Wheat. 1, 209 (1824) (Marshall, C. J.) (dictum).  The modern law of what has come to be called the dormant Commerce Clause is driven by concern about "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."  *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 273–274 (1988).  The point is to "effectuat[e] the Framers' purpose to 'prevent a State from retreating into [the] economic isolation,'" *Fulton Corp.* v. *Faulkner*, 516 U. S. 325, 330 (1996) (quoting *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.*, 514 U. S.

175, 180 (1995); brackets omitted), "that had plagued relations among the Colonies and later among the States under the Articles of Confederation," *Hughes* v. *Oklahoma*, 441 U. S. 322, 325–326 (1979).

The law has had to respect a cross purpose as well, for the Framers' distrust of economic Balkanization was limited by their federalism favoring a degree of local autonomy.  Compare The Federalist Nos. 7 (A. Hamilton), 11 (A. Hamilton), and 42 (J. Madison), with The Federalist No. 51 (J. Madison); see also *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 546 (1985) ("The essence of our federal system is that within the realm of authority left open to them under the Constitution, the States must be equally free to engage in any activity that their citizens choose for the common weal").

Under the resulting protocol for dormant Commerce Clause analysis, we ask whether a challenged law discriminates against interstate commerce.  See *Oregon Waste Systems, Inc.* v. *Department of Environmental Quality of Ore.*, 511 U. S. 93, 99 (1994).  A discriminatory law is "virtually *per se* invalid," *ibid.;* see also *Philadelphia* v. *New Jersey*, 437 U. S. 617, 624 (1978), and will survive only if it "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives," *Oregon Waste Systems*, *supra*, at 101 (internal quotation marks omitted); see also *Maine* v. *Taylor*, 477 U. S. 131, 138 (1986).  Absent discrimination for the forbidden purpose, however, the law "will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970).  State laws frequently survive this *Pike* scrutiny, see, *e.g., United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U. S. ___, ___–___ (2007) (slip op., at 14–15) (plurality opinion); *Northwest Central Pipeline Corp.* v. *State Corporation Comm'n of Kan.*, 489 U. S. 493,

525–526 (1989); *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 472–474 (1981), though not always, as in *Pike* itself, 397 U. S., at 146.

Some cases run a different course, however, and an exception covers States that go beyond regulation and themselves "participat[e] in the market" so as to "exercis[e] the right to favor [their] own citizens over others." *Alexandria Scrap,* 426 U. S., at 810. This "market-participant" exception reflects a "basic distinction . . . between States as market participants and States as market regulators," *Reeves,* 447 U. S., at 436, "[t]here [being] no indication of a constitutional plan to limit the ability of the States themselves to operate freely in the free market," *id.,* at 437. See also *White* v. *Massachusetts Council of Constr. Employers, Inc.*, 460 U. S. 204, 208 (1983) ("[W]hen a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause"). Thus, in *Alexandria Scrap*, we found that a state law authorizing state payments to processors of automobile hulks validly burdened out-of-state processors with more onerous documentation requirements than their in-state counterparts. Likewise, *Reeves* accepted South Dakota's policy of giving in-state customers first dibs on cement produced by a state-owned plant, and *White* held that a Boston executive order requiring half the workers on city-financed construction projects to be city residents passed muster.

Our most recent look at the reach of the dormant Commerce Clause came just last Term, in a case decided independently of the market participation precedents. *United Haulers, supra,* upheld a "flow control" ordinance requiring trash haulers to deliver solid waste to a processing plant owned and operated by a public authority in New York State. We found "[c]ompelling reasons" for "treating [the ordinance] differently from laws favoring particular private businesses over their competitors." *Id.,* at \_\_\_ (slip

op., at 10). State and local governments that provide public goods and services on their own, unlike private businesses, are "vested with the responsibility of protecting the health, safety, and welfare of [their] citizens," *ibid.,* and laws favoring such States and their subdivisions may "be directed toward any number of legitimate goals unrelated to protectionism," *id.,* at ___ (slip op., at 11). That was true in *United Haulers*, where the ordinance addressed waste disposal, "both typically and traditionally a local government function." *Id.,* at ___ (slip op., at 12) (quoting *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 261 F. 3d 245, 264 (CA2 2001) (Calabresi, J., concurring); internal quotation marks omitted). And if more had been needed to show that New York's object was consequently different from forbidden protectionism, we pointed out that "the most palpable harm imposed by the ordinances—more expensive trash removal—[was] likely to fall upon the very people who voted for the laws," rather than out-of-state interests. *United Haulers,* 550 U. S., at ___ (slip op., at 13). Being concerned that a "contrary approach . . . would lead to unprecedented and unbounded interference by the courts with state and local government," *id.,* at ___ (slip op., at 11), we held that the ordinance did "not discriminate against interstate commerce for purposes of the dormant Commerce Clause," *id.,* at ___ (slip op., at 10).[8]

———————

[8] In so holding, we distinguished our decision in *C & A Carbone, Inc.* v. *Clarkstown*, 511 U. S. 383 (1994), which struck down a very similar ordinance on Commerce Clause grounds. The *Carbone* ordinance, however, benefited a private processing facility, and we found "this difference constitutionally significant" for the reasons adverted to in the main text. See *United Haulers,* 550 U. S., at ___ (slip op., at 1). Although the *Carbone* dissent argued that the private facility was "essentially a municipal facility," 511 U. S., at 419 (opinion of SOUTER, J.), *United Haulers* relied on the apparent view of the *Carbone* majority that the facility was properly characterized as private, see 550 U. S., at ___–___ (slip op., at 7–8).

## III

### A

It follows *a fortiori* from *United Haulers* that Kentucky must prevail. In *United Haulers,* we explained that a government function is not susceptible to standard dormant Commerce Clause scrutiny owing to its likely motivation by legitimate objectives distinct from the simple economic protectionism the Clause abhors. See *id.,* at \_\_\_ (slip op., at 11) ("Laws favoring local government . . . may be directed toward any number of legitimate goals unrelated to protectionism"); see also *id.,* at \_\_\_ (slip op., at 12) (noting that "[w]e should be particularly hesitant to interfere . . . under the guise of the Commerce Clause" where a local government engages in a traditional government function).[9] This logic applies with even greater force to

—————

[9] JUSTICE KENNEDY's dissent (hereinafter dissent) says this is just circular rationalization, that the *United Haulers* acceptance of governmental preference in support of public health, safety, and welfare is the equivalent of justifying the law as an exercise of the "police power" and thus an exercise in "tautology," since almost any state law could be so justified. See *post,* at 5. But this misunderstands what we said in *United Haulers*. The point of asking whether the challenged governmental preference operated to support a traditional public function was not to draw fine distinctions among governmental functions, but to find out whether the preference was for the benefit of a government fulfilling governmental obligations or for the benefit of private interests, favored because they were local. Under *United Haulers,* governmental public preference is constitutionally different from commercial private preference, and we make the governmental responsibility enquiry to identify the beneficiary as one or the other. See *supra,* at 9–10; *United Haulers, supra,* at \_\_\_ (slip op., at 11). Because this is the distinction at which the enquiry about traditional governmental activity is aimed, it entails neither tautology nor the hopeless effort to pick and choose among legitimate governmental activity that led to *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528 (1985).

One of the two fundamental points of difference between the Court and the dissenters is their rejection of the constitutional distinction between public and private preference, see *post,* at 6, 10, 12; the dis-

laws favoring a State's municipal bonds, given that the issuance of debt securities to pay for public projects is a quintessentially public function, with the venerable history we have already sketched, see *supra,* at 4–5. By issuing bonds, state and local governments "sprea[d] the costs of public projects over time," Amdursky & Gillette §1.1.3, at 11, much as one might buy a house with a loan subject to monthly payments. Bonds place the cost of a project on the citizens who benefit from it over the years, see *ibid.,* and they allow for public work beyond what current revenues could support, see *id.,* §1.2, at 12–13. Bond proceeds are thus the way to shoulder the cardinal civic responsibilities listed in *United Haulers:* protecting the health,[10] safety,[11] and welfare[12] of citizens. It should go without saying that the apprehension in *United Haulers* about "unprecedented . . . interference" with a traditional government function is just as warranted here, where the Davises would have us invalidate a century-old taxing practice, see *supra*, at 5, presently employed by 41 States, see n. 7, *supra*, and affirmatively supported by all of them, see Brief for 49 States as *Amici Curiae.*

In fact, this emphasis on the public character of the enterprise supported by the tax preference is just a step in addressing a fundamental element of dormant Commerce Clause jurisprudence, the principle that "any notion of

---

senters thus carry on the battle that was fought in *United Haulers.* (The second fundamental difference goes to the realism and legitimacy of treating bond issuance and tax provisions as aggregated features of a single scheme of public finance. Compare *infra,* at 15–16, with *post,* at 6, 14.)

[10] See, *e.g.,* The Bond Buyer, Apr. 20, 2007, p. 31, col. 2 (describing bond issue by the Grayson County Public Hospital District Corporation).

[11] See, *e.g., id.,* June 20, 2007, p. 29, col. 3 (describing bond issue by Todd County for a "Detention Facility Project").

[12] See, *e.g., id.,* Apr. 20, 2007, p. 31, cols. 2–3 (describing bond issue by the Johnson County School District Finance Corporation).

discrimination assumes a comparison of substantially similar entities." *United Haulers,* 550 U. S., at \_\_\_ (slip op., at 10) (internal quotation marks omitted) (quoting *General Motors Corp.* v. *Tracy*, 519 U. S. 278, 298 (1997)). In *Bonaparte* v. *Tax Court*, 104 U. S. 592 (1882), a case involving the Full Faith and Credit Clause, we held that a foreign State is properly treated as a private entity with respect to state-issued bonds that have traveled outside its borders. See *id.,* at 595 (beyond its borders, a debtor State "is compelled to go into the market as a borrower, subject to the same disabilities in this particular as individuals," and has none "of the attributes of sovereignty as to the debt it owes"). Viewed through this lens, the Kentucky tax scheme parallels the ordinance upheld in *United Haulers:* it "benefit[s] a clearly public [issuer, that is, Kentucky], while treating all private [issuers] exactly the same." 550 U. S., at \_\_\_ (slip op., at 10). There is no forbidden discrimination because Kentucky, as a public entity, does not have to treat itself as being "substantially similar" to the other bond issuers in the market.[13]

Thus, *United Haulers* provides a firm basis for reversal. Just like the ordinances upheld there, Kentucky's tax exemption favors a traditional government function without any differential treatment favoring local entities over substantially similar out-of-state interests. This type of law does "not 'discriminate against interstate commerce' for purposes of the dormant Commerce Clause." *Id.,* at \_\_\_ (slip op., at 13).

---

[13] Contrary to the dissent, see *post,* at 11, we do not suggest that the only market at issue here is a discrete market for Kentucky bonds. In fact, we recognize that the relevant market can be conceived more broadly. See *infra,* at 20–21. Our point goes not to the contours of the market, but to the proper characterization of the various entities acting in the market.

B

This case, like *United Haulers,* may also be seen under the broader rubric of the market participation doctrine, although the Davises say that market participant cases are inapposite here. In their view, we may not characterize state action under the Kentucky statutes as market activity for public purposes, because this would ignore a fact absent in *United Haulers* but central here: this is a case about differential taxation, and a difference that amounts to a heavier tax burden on interstate activity is forbidden, see, *e.g., Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564 (1997) (invalidating statute exempting charities from real estate and personal property taxes unless conducted or operated principally for the benefit of out-of-state residents); *Fulton Corp.*, 516 U. S. 325 (striking down tax on corporate stock held by state residents, where rate of tax was inversely proportional to the corporation's exposure to the State's income tax); *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984) (holding excise tax on sale of liquor at wholesale unconstitutional because it exempted some locally produced alcoholic beverages).

The Davises make a fair point to the extent that they argue that Kentucky acts in two roles at once, issuing bonds and setting taxes, and if looked at as a taxing authority it seems to invite dormant Commerce Clause scrutiny of its regulatory activity, see *Walling* v. *Michigan*, 116 U. S. 446, 455 (1886) ("A discriminating tax imposed by a State operating to the disadvantage of the products of other States when introduced into the first mentioned State, is, in effect, a regulation in restraint of commerce among the States, and as such is a usurpation of the power conferred by the Constitution upon the Congress"); see also *Camps Newfound, supra*, at 578 ("[I]t is clear that discriminatory burdens on interstate commerce imposed by regulation or taxation may . . . violate the Commerce

Clause"); *Tracy, supra,* at 287 ("The negative or dormant implication of the Commerce Clause prohibits state taxation . . . that discriminates against or unduly burdens interstate commerce").

But there is no ignoring the fact that imposing the differential tax scheme makes sense only because Kentucky is also a bond issuer. The Commonwealth has entered the market for debt securities, just as Maryland entered the market for automobile hulks, see *Alexandria Scrap*, 426 U. S., at 806, and South Dakota entered the cement market, see *Reeves*, 447 U. S., at 440. It simply blinks this reality to disaggregate the Commonwealth's two roles and pretend that in exempting the income from its securities, Kentucky is independently regulating or regulating in the garden variety way that has made a State vulnerable to the dormant Commerce Clause. States that regulated the price of milk, see, *e.g., West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186 (1994); *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511 (1935), did not keep herds of cows or compete against dairy producers for the dollars of milk drinkers. But when Kentucky exempts its bond interest, it is competing in the market for limited investment dollars, alongside private bond issuers and its sister States, and its tax structure is one of the tools of competition.[14]

The failure to appreciate that regulation by taxation here goes hand in hand with market participation by selling bonds allows the Davises to advocate the error of focusing exclusively on the Commonwealth as regulator and ignoring the Commonwealth as bond seller, see Brief for Respondents 36–39, just as the state court did in saying that "'when a state chooses to tax its citizens, it is

---

[14]The dissent overlooks this discussion when it claims that we contend Kentucky does not compete with other municipal bond issuers. See *post,* at 8.

acting as a market regulator[,]' not as a market participant." 197 S. W. 3d, at 564 (quoting *Shaper*, 97 Ohio App. 3d, at 764, 647 N. E. 2d, at 552).[15]   To indulge in this single vision, however, would require overruling most, if not all, of the cases on point decided since *Alexandria Scrap*.

   *White*, for example, also scrutinized a government acting in dual roles.  The mayor of Boston promulgated an executive order that bore the hallmarks of regulation: it applied to every construction project funded wholly or partially by city funds (or funds administered by the city), and it imposed general restrictions on the hiring practices of private contractors, mandating that 50% of their work forces be bona fide Boston residents and setting thresholds for minorities (25%) and women (10%) as well.  See 460 U. S., at 205, n. 1; see also *id.,* at 218–219 (Blackmun, J., concurring in part and dissenting in part) ("The executive order in this case . . . is a direct attempt to govern private economic relationships. . . . [It] is the essence of regulation").  At the same time, the city took part in the market by "expend[ing] its own funds in entering into construction contracts for public projects."  *Id.,* at 214–215 (opinion of the Court).  After speaking of "'[t]he basic distinction . . . between States as market participants and States as market regulators,'" *id.,* at 207 (quoting *Reeves, supra,* at 436–437), *White* did not dissect Boston's conduct and ignore the former.  Instead, the Court treated the regulatory activity in favor of local and minority labor as terms or conditions of the government's efforts in its market role, which was treated as dispositive.

   Similarly, in *Alexandria Scrap*, Maryland employed the tools of regulation to invigorate its participation in the market for automobile hulks.  The specific controversy there was over documentation requirements included in a

———————
[15] The dissent does the same.  See *post,* at 6, 14.

"comprehensive statute designed to speed up the scrap cycle." 426 U. S., at 796. Superficially, the scheme was regulatory in nature; but the Court's decision was premised on its view that, in practical terms, Maryland had not only regulated but had also "entered into the market itself to bid up [the] price" of automobile hulks. See *id.,* at 806.

*United Haulers,* though not placed under the market participant umbrella, may be seen as another example. Not only did the public authority acting in that case process trash, but its governmental superiors forbade trash haulers to deal with any other processors. This latter fact did not determine the outcome, however; the dispositive fact was the government's own activity in processing trash. We upheld the government's decision to shut down the old market for trash processing only because it created a new one all by itself, and thereby became a participant in a market with just one supplier of a necessary service. If instead the government had created a monopoly in favor of a private hauler, we would have struck down the law just as we did in *C & A Carbone, Inc.* v. *Clarkstown*, 511 U. S. 383 (1994). *United Haulers* accordingly turned on our decision to give paramount consideration to the public function in actively dealing in the trash market; if the Davises had their way, *United Haulers* would be overruled and the market participation doctrine would describe a null set (or maybe a set of one, see *Reeves, supra*).

In each of these cases the commercial activities by the governments and their regulatory efforts complemented each other in some way, and in each of them the fact of tying the regulation to the public object of the foray into the market was understood to give the regulation a civic objective different from the discrimination traditionally held to be unlawful: in the paradigm of unconstitutional discrimination the law chills interstate activity by creating a commercial advantage for goods or services marketed by local private actors, not by governments and those they

employ to fulfill their civic objectives, see, *e.g., Fulton Corp.*, 516 U. S. 325 (higher tax on the stock of corporations with little or no presence in the State); *New Energy Co. of Ind.*, 486 U. S. 269 (tax credit to sellers of ethanol available only for ethanol produced in the State); *Bacchus Imports, Ltd.*, 468 U. S. 263 (tax exemption that applied only to sales of certain locally produced liquors); *Lewis* v. *BT Investment Managers, Inc.*, 447 U. S. 27 (1980) (prohibition on out-of-state banks owning in-state businesses that provided investment advisory services); *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318 (1977) (higher tax on sale of securities by nonresidents if the securities were sold on an out-of-state, not an in-state, exchange).  In sum, our cases on market regulation without market participation prescribe standard dormant Commerce Clause analysis; our cases on market participation joined with regulation (the usual situation) prescribe exceptional treatment for this direct governmental activity in commercial markets for the public's benefit.[16]

The Kentucky tax scheme falls outside the forbidden paradigm because the Commonwealth's direct participation favors, not local private entrepreneurs, but the Commonwealth and local governments.  The Commonwealth enacted its tax code with an eye toward making some or all of its bonds more marketable.  When it issues them for sale in the bond market, it relies on that tax code, and seller and purchaser treat the bonds and the tax rate as joined just as intimately, say, as the work force require-

---

[16] Significantly, our market participant cases are not limited to cases where the government supplies a uniquely public product.  This much is manifest from *Reeves, Inc.* v. *Stake*, 447 U. S. 429 (1980).  There is nothing remarkable or inherently governmental about the cement South Dakota produced, and yet we recognized that the State may engage in clear discrimination against out-of-state buyers that regular dormant Commerce Clause analysis would undoubtedly have held unconstitutional.

ments and city construction contracts were in Boston. Issuing bonds must therefore have the same significance under the dormant Commerce Clause as government trash processing, junk car disposal, or construction; and *United Haulers, Alexandria Scrap*, and *White* can be followed only by rejecting the Davises' argument that Kentucky's regulatory activity should be viewed in isolation as Commerce Clause discrimination.[17]

————————

[17] The dissent criticizes this analysis on the basis of our statement in *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison,* 520 U. S. 564, 593 (1997), that "[a] tax exemption is not the sort of direct state involvement in the market that falls within the market-participation doctrine." See *post,* at 14. This both misses the point and leaves the language from *Camps Newfound* shorn of context. In *Camps Newfound*, the tax exemption was unaccompanied by any market activity by the State; it favored only private charitable institutions. We correctly rejected the argument that a tax exemption without more constitutes market participation. But we had no occasion to consider the scheme here, where a State employs a tax exemption to facilitate its own participation in the market. As noted before, one of the dissent's critical premises is the disaggregation of bond issuance and tax treatment, see *post,* at 6, 14; that strikes us as a denial of economic reality.

The dissent also suggests that our reasoning conflicts with *South-Central Timber Development, Inc.* v. *Wunnicke*, 467 U. S. 82 (1984), see *post,* at 14–15, but there is no conflict. In *South-Central,* Alaska conditioned the sale of state timber to private purchasers by requiring that the timber be processed within the State prior to export, and a plurality struck down the condition under the Commerce Clause. The case turned on the plurality's conclusion that the processing requirement constituted a "restrictio[n] on dispositions subsequent to the goods coming to rest in private hands." 467 U. S., at 98; see *id.,* at 95 ("Under the Alaska requirement, . . . the choice is made for [the purchaser]: if he buys timber from the State he is not free to take the timber out of state prior to processing"). Kentucky imposes no such restrictions on the disposition of Kentucky bonds; bond holders are free to sell the bonds to whomever they please. Thus, the type of "downstream regulation" that *South-Central* found objectionable is simply not present here. *Id.*, at 99. We note also that *South-Central* expressly applied "more rigorous" Commerce Clause scrutiny because the case involved "foreign commerce" and restrictions on the resale of "a natural resource." *Id.,* at 100, 96. Neither of those elements appears here.

C

A look at the specific markets in which the exemption's effects are felt both confirms the conclusion that no traditionally forbidden discrimination is underway and points to the distinctive character of the tax policy. The market as most broadly conceived is one of issuers and holders of all fixed-income securities, whatever their source or ultimate destination. In this interstate market, Kentucky treats income from municipal bonds of other States just like income from bonds privately issued in Kentucky or elsewhere; no preference is given to any local issuer, and none to any local holder, beyond what is entailed in the preference Kentucky grants itself when it engages in activities serving public objectives.

A more specialized market can be understood as commerce solely in federally tax-exempt municipal bonds, much of it conducted through interstate municipal bond funds.[18] Here, of course, the distinction between the taxing State's bonds and their holders and issuers and holders of out-of-state counterparts is at its most stark. But what is remarkable about the issuers in this and the

---

[18] See Brief for National Federation of Municipal Analysts as *Amicus Curiae* 11 (hereinafter National Federation Brief) ("In 2006, tax-exempt mutual funds held approximately $365 billion in long-term [municipal] bonds, of which approximately $155 billion were held in 481 single-state funds and approximately $210 billion in 230 national funds . . . [and as of March 2007,] approximately $254 billion [in short-term municipal bonds] were held in national tax-exempt money market funds and approximately $125 billion in single state tax-exempt money market funds" (citing Investment Company Institute, 2007 Investment Company Fact Book 96, 98; Lipper Analytical Services, Tax-Exempt Fixed Income Fund Performance Analysis, 1st Quarter 2007 Report)); National Federation Brief 12 ("[A]pproximately 58% of . . . long-term municipal bonds [owned by mutual funds] and approximately 67% of . . . short-term municipal securities were purchased without regard to a match between the state of the bond issuer and the state of the fund's shareholders").

Opinion of the Court

broader interstate market is that nearly every taxing State believes its public interests are served by the same tax-and-exemption feature, which is supported in this Court by every one of the States (with or without an income tax) despite the ranges of relative wealth and tax rates among them. See Brief for 49 States as *Amici Curiae*. These facts suggest that no State perceives any local advantage or disadvantage beyond the permissible ones open to a government and to those who deal with it when that government itself enters the market. See *supra,* at 14–18.

An equally significant perception emerges from examining the third type of market for municipal bonds: the one for bonds within the State of issue, a large proportion of which market in each State is managed by one or more single-state funds. By definition, there is no discrimination against interstate activity within the market itself, but one of its features reveals an important benefit of intrastate bond markets as they operate through these funds. The intrastate funds absorb securities issued by smaller or lesser known municipalities that the interstate markets tend to ignore. See National Federation Brief 15 (compared with single-state funds, "[n]ational mutual funds . . . are less likely to dedicate the time necessary to evaluate a small, obscure or infrequent municipal bond issuer or to purchase bonds issued by such public entities"); *id.,* at 19 ("[N]ational mutual funds place a higher premium on the liquidity of their holdings than do single state funds, which are willing to purchase less liquid municipal bonds of smaller and less familiar issuers because of the state tax advantage and the fund's mandate to purchase bonds issued within a specific state").

There is little doubt that many single-state funds would disappear if the current differential tax schemes were upset. See *id.,* at 18 ("[O]ne predictable impact of the elimination of tax incentives for the purchase of municipal

bonds issued in a specific state would be the disappear- ance, through consolidation into national mutual funds, of single state mutual funds"); *ibid.* ("Although a handful of single state funds might continue to exist for a small number of states (such as Florida) with high populations that have a high affinity for local bond issuers, the current state tax system is the *raison d'être* for virtually all single state funds, and they would cease to be financially viable in the absence of a tax advantage that outweighed their relative lack of diversification vis-à-vis national funds and their reduced asset base"); accord, Brief for Respondents 29 (the States' tax exemptions "have fostered the growth of funds that hold only the municipal bonds of a single state," which "[a]s compared [with] national tax-exempt bonds funds . . . tend to be higher risk and higher cost"); 11 Kiplinger's Retirement Report, Win With Home-State Muni Bond Funds, p. 2 (Dec. 2004) (noting that in States without a differential taxation scheme, "there's little incentive to create [single-state] muni bond funds").

Nor is there any suggestion that the interstate markets would discover some new reason to welcome the weaker municipal issues that would lose their local market homes after a victory for the Davises here. See National Federa- tion Brief 18, 19 ("The main adverse impact of the disap- pearance of single state funds . . . would be felt by small municipal issuers" because they "would stand to lose much of the intrastate market for the bonds that has developed under the currently prevailing state tax system without gaining much of an interstate market from its elimina- tion"). Financing for long-term municipal improvements would thus change radically if the differential tax feature disappeared.[19]

--------

[19] The Davises themselves, in their opposition to the petition, explain that if the tax exemptions are removed, "states will open their invest- ment sales to the entire national market for debt instruments." Brief

This probable indispensability of the current scheme to maintaining single-state markets serving smaller municipal borrowers not only underscores how far the States' objectives probably lie from the forbidden protectionism for local business; it also tends to explain why the States are so committed to a taxing practice that much scholarship says often produces a net burden of tax revenues lost over interest expense saved. See, *e.g.,* Brief for Alan D. Viard et al. as *Amici Curiae* 19 ("[S]tates routinely fail to recoup the cost of the tax subsidy in the form of lower financing rates" (citing Chalmers, Default Risk Cannot Explain the Muni Puzzle: Evidence from Municipal Bonds that are Secured by U. S. Treasury Obligations, 11 Rev. Financial Studies 281, 282–283 (1998))).

In sum, the differential tax scheme is critical to the operation of an identifiable segment of the municipal financial market as it currently functions, and this fact alone demonstrates that the unanimous desire of the States to preserve the tax feature is a far cry from the private protectionism that has driven the development of the dormant Commerce Clause. It is also fatal to the Davises' backup argument that this case should be remanded for analysis under the rule in *Pike*, 397 U. S. 137.

IV

Concluding that a state law does not amount to forbidden discrimination against interstate commerce is not the death knell of all dormant Commerce Clause challenges, for we generally leave the courtroom door open to plaintiffs invoking the rule in *Pike,* that even nondiscrimina-

_____

in Opposition 10–11. As a result, the Davises say, "[o]nce states compete in the financial markets without the protective benefit of coercive tax schemes, they will have to be more selective in what projects they choose to fund. . . . [T]he market will provide incentives for governments to be more careful in selecting and funding projects through bond sales." *Id.,* at 11, n. 5.

tory burdens on commerce may be struck down on a show-
ing that those burdens clearly outweigh the benefits of a
state or local practice. See *id.,* at 142. The Kentucky
courts made no *Pike* enquiry, and the Davises ask us to
remand for one now, see Brief for Respondents 43.

The Davises' request for *Pike* balancing assumes an
answer to an open question: whether *Pike* even applies to
a case of this sort. *United Haulers* included a *Pike* analy-
sis, see 550 U. S., at ___–___ (slip op., at 14–15) (plurality
opinion), but our cases applying the market participant
exception have not, see, *e.g., White*, 460 U. S. 204; *Alexan-
dria Scrap*, 426 U. S. 794. We need not decide this ques-
tion today, however, for Kentucky has not argued that
*Pike* is irrelevant, see Reply Brief for Petitioners 2, n. 1,
and even on the assumption that a *Pike* examination
might generally be in order in this type of case, the cur-
rent record and scholarly material convince us that the
Judicial Branch is not institutionally suited to draw reli-
able conclusions of the kind that would be necessary for
the Davises to satisfy a *Pike* burden in this particular
case.

The institutional difficulty is manifest in the very train
of disadvantages that the Davises' counsel attributes to
the current differential tax scheme:

> "First, it harms out-of-state issuers (*i.e.*, other States
> and their subdivisions) by blocking their access to in-
> vestment dollars in Kentucky. Second, it similarly
> harms out-of-state private sellers (*e.g.*, underwriters,
> individuals, and investment funds) who wish to sell
> their bonds in Kentucky. Third, it harms the national
> municipal bond market and its participants by distort-
> ing and impeding the free flow of capital. Fourth, it
> harms Kentucky investors by promoting risky, high-
> cost investment vehicles. Fifth, it harms the States
> by compelling them to enact competing discriminatory

laws that decrease their net revenues." Brief for Respondents 9.

Even if each of these drawbacks does to some degree eventuate from the system, it must be apparent to anyone that weighing or quantifying them for a cost-benefit analysis would be a very subtle exercise. It is striking, after all, that most of the harms allegedly flowing directly or indirectly to Kentucky's sister States and their citizens have failed to dissuade even a single State from supporting the current system; every one of them, including States with no income tax, have lined up with Kentucky in this case.

  The prospect for reliable *Pike* comparison dims even further when we turn to the benign function of the current system flagged a moment ago. Is any court in a position to evaluate the advantage of the current market for bonds issued by the smaller municipalities, the ones with no ready access to any other bond market than single-state funds? Consider that any attempt to place a definite value on this feature of the existing system would have to confront the what-if questions. If termination of the differential tax scheme jeopardized or eliminated most single-state funds (as the cited authorities predict) would some new source of capital take their place? Would the interstate markets accommodate the small issuers (as no cited authorities predict), or would the financing in question be replaced by current local taxation for long-term projects (unlikely, considering that financially weaker borrowers are involved), or would state governments assume responsibility through their own bonds or by state taxation? Or would capital to some degree simply dry up, eliminating a class of municipal improvements?[20]  And if some new

---

  [20] History bears out the concern that poorer places may have a harder time taking on at least some types of local investments. See Goldin & Katz, The Shaping of Higher Education: The Formative Years in the

source or sources of capital became available for these improvements in a given State, how likely is it that the new scheme would produce measurable net benefits to other States seeking capital, and how perceptibly would it produce a freer flow of funds?  Money spent up front on increased local or state taxation is no more available for out-of-state investment than money invested in local bonds; sinking funds would be obviated, but what would the effect be on interstate capital flows?

What is most significant about these cost-benefit questions is not even the difficulty of answering them or the inevitable uncertainty of the predictions that might be made in trying to come up with answers, but the unsuitability of the judicial process and judicial forums for making whatever predictions and reaching whatever answers are possible at all.  See *Tracy*, 519 U. S., at 308 ("[T]he Court is institutionally unsuited to gather the facts upon which economic predictions can be made, and professionally untrained to make them"); cf. *Fulton Corp.*, 516 U. S., at 342 ("'[C]ourts as institutions are poorly equipped to evaluate with precision the relative burdens of various methods of taxation.  The complexities of factual economic proof always present a certain potential for error, and courts have little familiarity with the process of evaluating the relative economic burden of taxes'" (quoting *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575, 589–590 (1983))).

While it is not our business to suggest that the current system be reconsidered, if it is to be placed in question a congressional forum has two advantages.  Congress has some hope of acquiring more complete information than

---

United States, 1890 to 1940, 13 J. Econ. Perspectives 37, 50–55 (Winter 1999) (per capita spending on public universities depended on local wealth); Goldin, America's Graduation from High School: The Evolution and Spread of Secondary Schooling in the Twentieth Century, 58 J. Econ. Hist. 345, 369–372 (1998) (likewise for public high schools).

adversary trials may produce, and an elected legislature is the preferable institution for incurring the economic risks of any alteration in the way things have traditionally been done. And risk is the essence of what the Davises are urging here. It would miss the mark to think that the Kentucky courts, and ultimately this Court, are being invited merely to tinker with details of a tax scheme; we are being asked to apply a federal rule to throw out the system of financing municipal improvements throughout most of the United States, and the rule in *Pike* was never intended to authorize a court to expose the States to the uncertainties of the economic experimentation the Davises request.

\*     \*     \*

The dissent rightly praises the virtues of the free market, and it warns that our decision to uphold Kentucky's tax scheme will result in untoward consequences for that market. See, *e.g., post,* at 15. But the warning is alarmism; going back to 1919 the state regimes of differential bond taxation have been elements of the national commerce without wilting the Commerce Clause. The threat would come, instead, from the dissent's approach, which to a certainty would upset the market in bonds and the settled expectations of their issuers based on the experience of nearly a century.

We have been here before. Our predecessors on this Court responded to an earlier invitation to the adventurism of overturning a traditional local taxing practice. Justice Holmes answered that "the mode of taxation is of long standing, and upon questions of constitutional law the long settled habits of the community play a part . . . . [T]he fact that the system has been in force for a very long time is of itself a strong reason . . . for leaving any improvement that may be desired to the legislature."

Opinion of the Court

*Paddell* v. *City of New York*, 211 U. S. 446, 448 (1908).[21]

The judgment of the Court of Appeals of Kentucky is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

––––––––––

[21] The dissent thinks the need to preserve existing financing practices is the true "controlling rationale" of our holding, *post,* at 15, but not acknowledged as such. As Justice Holmes's opinion shows, practical consequences have always been relevant in deciding the constitutionality of local tax laws. The practical considerations discussed here support the traditional distinction between permissible public preferences and the forbidden discriminations for the benefit of local private interests.

# SUPREME COURT OF THE UNITED STATES

No. 06–666

DEPARTMENT OF REVENUE OF KENTUCKY, ET AL.,
PETITIONERS *v.* GEORGE W. DAVIS ET UX.

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
KENTUCKY

[May 19, 2008]

JUSTICE STEVENS, concurring.

Having dissented in both *Reeves, Inc.* v. *Stake,* 447 U. S. 429 (1980), and *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U. S. \_\_\_ (2007), it seems appropriate to state briefly why I would join the Court's opinion even if those cases had been decided differently. *Reeves* and *United Haulers* involved state participation in commercial markets—the market for cement in *Reeves* and the market for waste disposal in *United Haulers.* The state entities in those cases imposed burdens on the private market for commercial goods and services. In this case Kentucky and its local governmental units engage in no private trade or business; they are merely borrowers of funds needed to finance public improvements.

Putting to one side cases in which a State may create a "market that did not previously exist," see *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794, 815 (1976) (STEVENS, J., concurring), I agree with Justice Powell's view that when a "State enters the private market and operates a commercial enterprise for the advantage of its private citizens, it may not evade the constitutional policy against economic Balkanization." *Reeves*, 447 U. S., at 449–450 (dissenting opinion). On the other hand, if a State merely borrows money "to pay for spending on

transportation, public safety, education, utilities, and environmental protection," *ante*, at 3, it does not "operat[e] a commercial enterprise" for purposes of the dormant Commerce Clause. As the majority of this Court stressed in *C & A Carbone, Inc.* v. *Clarkstown*, 511 U. S. 383 (1994)—and JUSTICE ALITO reiterated in his dissent in *United Haulers*—instead of enacting "flow control" waste disposal ordinances, the local governments would have been

> "free, of course, to 'subsidize the[ir] [program] through general taxes or municipal bonds. But having elected to use the open market to earn revenues for' their waste management program, [they] 'may not employ discriminatory regulation to give that [program] an advantage over rival businesses from out of State.'" 550 U. S., at ___ (slip op., at 14) (quoting *Carbone*, 511 U. S., at 394; citation omitted).

A State's reliance on "general taxes or municipal bonds" to finance public projects does not merit the same Commerce Clause scrutiny as "operating a fee-for-service business enterprise in an area in which there is an established interstate market." 550 U. S., at ___ (slip op., at 8) (ALITO, J., dissenting). I am not persuaded that the Commerce Clause analysis should change just because Kentucky chooses to make the interest it pays on its own municipal bonds, which is already tax exempt under federal law, also tax exempt under Kentucky law.

The citizens of Kentucky provide the natural market for the purchase of Kentucky's bonds because they are also the beneficiaries of the programs being financed. Moreover, it is their tax payments that will enable Kentucky to pay the interest on the bonds and to discharge its indebtedness. The tax exemption for Kentucky citizens enhances the marketability of Kentucky bonds in the Kentucky market, motivating local support for local public

STEVENS, J., concurring

improvements. Instead of issuing bonds, Kentucky could have borrowed funds from a Kentucky bank or issued notes to a syndicate of Kentucky lenders without implicating the Commerce Clause, even though such fundraising would preclude an equal amount of money in Kentucky from entering the interstate market for bonds.* Free tickets to the Kentucky Derby for purchasers of the bonds would have a comparable, though presumably lesser, effect. In my judgment state action that motivates the State's taxpayers to lend money to the State is simply not the sort of "burden" on interstate commerce that is implicated by our dormant Commerce Clause jurisprudence.

—————

*Indeed, Kentucky could have just increased taxes. By issuing bonds in lieu of increasing taxes, Kentucky has enlarged the interstate market for securities, as well as increased the money available to Kentucky citizens to partake in this market.

# SUPREME COURT OF THE UNITED STATES

———————

No. 06–666

———————

## DEPARTMENT OF REVENUE OF KENTUCKY, ET AL., PETITIONERS *v.* GEORGE W. DAVIS ET UX.

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF KENTUCKY

[May 19, 2008]

CHIEF JUSTICE ROBERTS, concurring in part.

I join all but Part III–B of the opinion of the Court. In my view, the case is readily resolved by last Term's decision in *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority,* 550 U. S. \_\_\_ (2007). A majority of the Court shares this view. That being the case, I see no need to proceed to the alternative analysis in Part III–B.

# SUPREME COURT OF THE UNITED STATES

_____

No. 06–666

_____

DEPARTMENT OF REVENUE OF KENTUCKY, ET AL.,
PETITIONERS *v.* GEORGE W. DAVIS ET UX.

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF
KENTUCKY

[May 19, 2008]

JUSTICE SCALIA, concurring in part.

I join all but Part III–B and Part IV of the opinion of the Court. I will apply our negative Commerce Clause doctrine only when *stare decisis* compels me to do so. In my view it is "an unjustified judicial invention, not to be expanded beyond its existing domain." *General Motors Corp.* v. *Tracy*, 519 U. S. 278, 312 (1997) (SCALIA, J., concurring). *Stare decisis* does not compel invalidation of Kentucky's statute. As the Court explains, it would be no small leap from invalidating state discrimination in favor of private entities to invalidating state discrimination in favor of the State's own subdivisions performing a traditional governmental function. To apply the negative Commerce Clause in this area would broaden the doctrine "'beyond its existing scope, and intrude on a regulatory sphere traditionally occupied by . . . the States.'" *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U. S. ___, ___ (2007) (slip op., at 2) (SCALIA, J., concurring in part) (omission in original). That is enough for me.

I do not join Part III–B of the opinion of the Court because I think Part III–A adequately resolves the issue. I also do not join Part IV, which describes the question whether so-called *Pike* balancing applies to laws like this as an "open" one. *Ante*, at 24. The Court declines to en-

gage in *Pike* balancing here because courts are ill suited to determining whether or not this law imposes burdens on interstate commerce that clearly outweigh the law's local benefits, and the "balancing" should therefore be left to Congress. See *ante*, at 24–27. The problem is that courts are less well suited than Congress to perform this kind of balancing in every case. The burdens and the benefits are always incommensurate, and cannot be placed on the opposite balances of a scale without assigning a policy-based weight to each of them. It is a matter not of weighing apples against apples, but of deciding whether three apples are better than six tangerines. Here, on one end of the scale (the burden side) there rests a certain degree of suppression of interstate competition in borrowing; and on the other (the benefits side) a certain degree of facilitation of municipal borrowing. Of course you cannot decide which interest "outweighs" the other without deciding which interest is more important to you. And that will always be the case. I would abandon the *Pike*-balancing enterprise altogether and leave these quintessentially legislative judgments with the branch to which the Constitution assigns them. See *Bendix Autolite Corp.* v. *Midwesco Enterprises, Inc.*, 486 U. S. 888, 897–898 (1988) (SCALIA, J., concurring in judgment).

# SUPREME COURT OF THE UNITED STATES

‗‗‗‗‗‗‗‗‗‗

No. 06–666

‗‗‗‗‗‗‗‗‗‗

## DEPARTMENT OF REVENUE OF KENTUCKY, ET AL., PETITIONERS *v.* GEORGE W. DAVIS ET UX.

### ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF KENTUCKY

[May 19, 2008]

JUSTICE THOMAS, concurring in the judgment.

I agree with the Court that Kentucky's differential tax scheme is constitutional. But rather than apply a body of doctrine that "has no basis in the Constitution and has proved unworkable in practice," I would entirely "discard the Court's negative Commerce Clause jurisprudence." *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U. S. \_\_\_, \_\_\_ (2007) (slip op., at 1) (THOMAS, J., concurring in judgment). See also *American Trucking Assns., Inc.* v. *Michigan Pub. Serv. Comm'n*, 545 U. S. 429, 439 (2005) (same) ("'[T]he negative Commerce Clause has no basis in the text of the Constitution, makes little sense, and has proved virtually unworkable in application'" (quoting *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 610 (1997) (THOMAS, J., dissenting))). Because Congress' authority to regulate commerce "among the several States," U. S. Const., Art. I, §8, cl. 3, necessarily includes the power "to prevent state regulation of interstate commerce," *United Haulers, supra,* at \_\_\_ (slip op., at 2) (THOMAS, J., concurring in judgment), the text of the Constitution makes clear that the Legislature—not the Judiciary—bears the responsibility of curbing what it perceives as state regulatory burdens on interstate commerce.

As the Court acknowledges, Kentucky's differential tax

scheme is far from unique. *Ante*, at 1. For nearly a century, some States have treated income derived from out-of-state bonds differently than that derived from their in-state counterparts. *Ibid.* At present, the vast majority of the States do so. *Ante*, at 5. The practice is thus both longstanding and widespread, yet Congress has refrained from preempting it. Cf. *New Jersey Realty Title Ins. Co.* v. *Division of Tax Appeals of N. J.*, 338 U. S. 665, 671 (1950) (holding that a federal statute exempting interest-bearing obligations of the United States from state and local taxation pre-empted a conflicting state statute). In the "face of [this] congressional silence," *United Haulers, supra,* at ___ (slip op., at 5) (THOMAS, J., concurring in judgment), we have no authority to invalidate Kentucky's differential tax scheme. I would reverse the judgment below on that basis.

# SUPREME COURT OF THE UNITED STATES

No. 06–666

DEPARTMENT OF REVENUE OF KENTUCKY, ET AL., PETITIONERS *v*. GEORGE W. DAVIS ET UX.

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF KENTUCKY

[May 19, 2008]

JUSTICE KENNEDY, with whom JUSTICE ALITO joins, dissenting.

Eighteenth-century thinkers, even those most prescient, could not foresee our technological and economic interdependence. Yet they understood its foundation. Free trade in the United States, unobstructed by state and local barriers, was indispensable if we were to unite to ensure the liberty and progress of the whole Nation and its people. This was the vision, and a primary objective, of the Framers of the Constitution. History, as we know, vindicates their judgment. The national, free market within our borders has been a singular force in shaping the consciousness and creating the reality that we are one in purpose and destiny. The Commerce Clause doctrine that emerged from the decisions of this Court has been appropriate and necessary to implement the Constitution's purpose and design.

These general observations are offered at the outset to underscore the imprudent risk the Court now creates by misinterpreting our precedents to decide this case. True, the majority opinion, wrong as it is, will not threaten the whole economy or national unity on these facts alone. The explicit, local discrimination the Court ratifies today likely will result in extra, though manageable, accommodation costs and can be welcomed by existing interests ready to

profit from it. This market perhaps can absorb the costs of discrimination; our jurisprudence, unless the decision stands alone as an anomaly, cannot.

Reactive institutions and adjusting forces—for instance mutual funds for state and municipal bonds issued within a single State—already are in place in response to the local protectionist laws here at issue and now in vogue. These mechanisms may allow the market, though necessarily distorted by deviation from essential constitutional principles, to continue to cope in a more or less efficient manner; and the damage likely will be limited to the discrete, and now distorted, market for state and municipal bonds. Many economists likely will find it unfortunate, and inefficient, that a specialized business has emerged to profit from a departure from constitutional principles. Even if today's decision is welcomed by those who profit from the discrimination, the system as a whole would benefit from a return to a market with proper form, freed from artificial restraints. It does seem necessary, however, to point out the systemic consequences of today's decision—if only to confine it and to discourage new experiments with local laws that discriminate against interstate commerce and trade.

The incorrect result the majority reaches; its treatment of the Commerce Clause cases in which our predecessors reached a delicate, sensible implementation of the Framers' original purpose; and the unsatisfactory, brief, circular reasoning contained in the part of the opinion that commands a majority of the Court are all inconsistent with our precedents and require this respectful dissent.

Protectionist trade laws and policies, pursued to favor local interests within a larger trading area, invite prompt retaliatory response. This dynamic was one the Framers understood in theory and saw in fact. See, *e.g., West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186, 193, n. 9 (1994). Under the Articles of Confederation the States enacted

protectionist laws. It proved difficult and costly, even in terms of political energies, to remove trade barriers by negotiated agreements; and the few resulting compacts seemed destined to favor the more powerful States. The immediate prospect of escalating trade barriers was real, and a national power to regulate national trade and re-move local barriers soon was deemed urgent. Open mar-kets and the elimination of trade barriers were the very concerns that led to the Annapolis Convention of 1786. See, *e.g.,* E. Morgan, The Birth of the Republic, 1763–89, p. 129 (1956). The frustrations of that meeting built a strong consensus for the necessity of a larger compact and led to the call for the Philadelphia Convention. See, *e.g.,* 1 S. Morison, H. Commager, & W. Leuchtenburg, The Growth of the American Republic 244 (rev. 6th ed. 1969). The object of creating free trade throughout a single na-tion, without protectionist state laws, was a dominant theme of the convention at Philadelphia and during the ratification debates that followed. See, *e.g.,* The Federalist No. 22, pp.143–144 (C. Rossiter ed. 1961) (A. Hamilton) ("It is indeed evident, on the most superficial view, that there is no object, either as it respects the interest of trade or finance, that more strongly demands a federal superintendence").

This dissent will not repeat an earlier, brief account of our Commerce Clause jurisprudence. See *United States* v. *Lopez*, 514 U. S. 549, 568–583 (1995) (KENNEDY, J., con-curring). The cases from *Gibbons* v. *Ogden*, 9 Wheat. 1 (1824), to *Willson* v. *Black Bird Creek Marsh Co.*, 2 Pet. 245 (1829), and then through *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299 (1852), began the elaboration of a rule respectful of local laws and local expertise, while preserv-ing the theory and fact of free trade throughout the Na-tion. Though an oversimplification, it suffices here to note that our commerce cases have invalidated two types of

local barriers: laws that impose unreasonable burdens upon interstate commerce; and laws that discriminate against it.

The doctrine invalidating laws that impose unreasonable burdens upon interstate commerce no doubt has been a deterrent to local enactments attempting to regulate in ways that restrict a free, national market. The corollary rule that nondiscriminatory laws imposing a reasonable burden are valid allows the States to exercise their powers based on information and expertise more readily available to them than to the National Government. The result is to eliminate the demand and necessity for sweeping national legislation. This line of cases has found occasional detractors. See, *e.g., CTS Corp.* v. *Dynamics Corp. of America*, 481 U. S. 69, 95 (1987) (SCALIA, J., concurring in part and concurring in judgment); *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 790–795 (1945) (Black, J., dissenting). The undue burden rule, however, remains an essential safeguard against restrictive laws that might otherwise be in force for decades until Congress can act. Those cases were the background for the formulation used in *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970), which is in essence ignored by the decision in today's case. See *ante*, at 23–27. The Court's precedents discussing the undue burden principle, and *Pike*, need not be addressed here, however.

That is because the law in question is invalid under a second line of precedents. These cases instruct that laws with either the purpose or the effect of discriminating against interstate commerce to protect local trade are void. These are the authorities relevant to the only part of the opinion that commands a majority, see *ante*, at 11–13, and it is necessary to address the reasons the Court advances in seeking to disregard them.

## I

The Court defends the Kentucky law by explaining that it serves a traditional government function and concerns the "cardinal civic responsibilities" of protecting health, safety, and welfare. See *ante*, at 12, and nn. 10–12. This is but a reformulation of the phrase "police power," long abandoned as a mere tautology. It is difficult to identify any state law that has come before us that would not meet the Court's description. That is why, with the unfortunate recent exception of *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority,* 550 U. S. ___ (2007), the Court had ceased to view the concept as saying anything instructive. A law may contravene a provision of the Constitution even if enacted for a beneficial purpose.

The police power concept is simply a shorthand way of saying that a State is empowered to enact laws in the absence of constitutional constraints; but, of course, that only restates the question. That a law has the police power label—as all laws do—does not exempt it from Commerce Clause analysis. The Court said this in a case striking down an order, based upon local flood control needs, directing a railroad to remove certain bridges and raise others that supported rail lines involved in interstate commerce: "[A] State cannot avoid the operation of [the Commerce Clause] by simply invoking the convenient apologetics of the police power." *Kansas City Southern R. Co.* v. *Kaw Valley Drainage Dist.*, 233 U. S. 75, 79 (1914) (opinion for the Court by Holmes, J.).

The Court holds the Kentucky law is valid because bond issuance fulfills a governmental function: raising revenue for public projects. See *ante*, at 11–12. Aside from the point that this is but an extension of the police power ("this is a good law") argument, the premise is wrong. The law in question operates on those who hold the bonds and trade them, not those who issue them. The bonds are not

issued with a covenant promising tax exemption or tax relief to the holder. The bonds contain no such provision. The security is issued as a formal obligation to repay. Not a word in the terms and conditions of the securities promises favored tax treatment for certain holders. Indeed, that could not be done without impairing marketability. It is simply not commercial or investment practice to make payment obligations turn upon either the residence of the holder or the State of the issuer. The issuer intends to use the interstate market for its bonds and does not encumber them with conditions giving premiums or penalties depending upon the residence of the holders.

Even if the Court were correct to say the relevant legal framework is bond issuance, not taxation of bonds already issued, its conclusion would be incorrect; for the discrimination against out-of-state commerce still would be too plain and prejudicial to be sustained. See, *e.g., United Haulers, supra,* at ___ (slip op., at 15) (ALITO, J., dissenting) ("[T]o the extent [the majority's] holding rests on a distinction between 'traditional' governmental functions and their nontraditional counterparts, it cannot be reconciled with prior precedent" (citation omitted)). The insufficiency of the Court's reasoning is even more apparent, however, because its own premise is incorrect. The challenged state activity is differential taxation, not bond issuance. The state tax provision at issue could be repealed tomorrow without altering or impairing a single obligation in the bonds. It is the tax that matters; and Kentucky gives favored tax treatment to some securities but not others depending solely upon the State of issuance, and it does so to disadvantage bonds from other States.

Our cases establish this rule: A State has no authority to use its taxing power to erect local barriers to out-of-state products or commodities. See, *e.g., West Lynn,* 512 U. S., at 193 ("The paradigmatic example of a law discriminating against interstate commerce is the protective

tariff or customs duty, which taxes goods imported from other States, but does not tax similar products produced in State"). Nothing in our cases even begins to suggest this rule is inapplicable simply because the State uses a discriminatory tax to favor its own enterprise. The tax imposed here is an explicit discrimination against out-of-state issuances for admitted protectionist purposes. It cannot be sustained unless the Court disavows the discrimination principle, one of the most important protections we have elaborated for the Nation's interstate markets.

The Court has ruled that protectionist, differential taxation with respect to securities sales is invalid. *Boston Stock Exchange* v. *State Tax Comm'n*, 429 U. S. 318 (1977). In that case the Court considered the validity of a New York transfer tax on securities transactions. New York taxed out-of-state sales more heavily than in-state sales. The transactions in question were concluded on stock exchanges, such as the Boston Stock Exchange, located outside New York State. All conceded the transactions had sufficient contacts with New York so it could impose a tax; the question was the validity of a higher rate on transactions closed on exchanges located out-of-state. The Court's unanimous opinion held that the discriminatory tax, designed to favor New York, was invalid. *Id.,* at 328. "[I]n the process of competition no State may discriminatorily tax the products manufactured or the business operations performed in any other State." *Id.,* at 337.

The same was true of the discriminatory tax exemption in *Bacchus Imports, Ltd.* v. *Dias*, 468 U. S. 263 (1984), which the Court invalidated after observing that "as long as there is some competition between the locally produced exempt products and nonexempt products from outside the State, there is a discriminatory effect." *Id.,* at 271. This principle refutes the majority's contention, see *ante*, at 12–13, that Kentucky's bonds do not compete with other state

or local government bonds. The relevant inquiry is not the purpose of a bond but whether the bond is a product that competes. The majority cannot establish that, from an investor's standpoint, Kentucky's bonds do not compete with bonds from other state or municipal governments. Indeed, that competition is why the bonds need the advantages the exemptions give them. Nothing in *Bacchus* suggested its holding was dependent upon the private nature of the favored competitors. Instead, in rejecting the argument that discriminatory taxation was justified because the goal was to promote local industry, the Court explained that the "determination of constitutionality" does not depend upon "the benefited or the burdened party." 468 U. S., at 273. This reasoning does not permit a different outcome when the State is the "benefited party."

The Court had little difficulty in holding invalid a discriminatory tax in *Fulton Corp.* v. *Faulkner*, 516 U. S. 325 (1996). There North Carolina had devised a tax on intangibles that employed a deduction scheme favoring those who owned stock in local companies by, in effect, taxing at a higher rate those who owned stock in out-of-state companies. *Id.,* at 327–328. The *Fulton* scheme favored "domestic corporations over their foreign competitors in raising capital among North Carolina residents and tend[ed], at least, to discourage domestic corporations from plying their trades in interstate commerce." *Id.,* at 333. The Court held the scheme invalid as contrary to the Commerce Clause. See *id.,* at 347.

Differential taxation favoring local trade over interstate commerce poses serious threats to the national free market because the taxing power is at once so flexible and so potent. The Court's differential tax cases are mentioned here at the outset because taxation is the issue; and discriminatory tax schemes are relatively rare, if only because they resemble tariffs—the "paradigmatic . . . law[s]

discriminating against interstate commerce," *West Lynn*, 512 U. S., at 193. See *ibid.* ("[T]ariffs against the products of other States are so patently unconstitutional that our cases reveal not a single attempt by any State to enact one. Instead, the cases are filled with state laws that aspire to reap some of the benefits of tariffs by other means").

The precedents forbidding discriminatory taxes are a subset of a larger class of cases that invalidate other regulations that favor local interests. These cases, too, are inconsistent with the Court's holding today. Bonds are commodities in interstate commerce, and in this respect consumers are entitled to choose them over local products just as with milk, *Dean Milk Co.* v. *Madison*, 340 U. S. 349 (1951); apples, *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333 (1977); solid waste for landfill, *Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dept. of Natural Resources*, 504 U. S. 353 (1992); solid waste for transfer, *C & A Carbone, Inc.* v. *Clarkstown*, 511 U. S. 383 (1994); out-of-state waste, *Philadelphia* v. *New Jersey*, 437 U. S. 617 (1978); and ethanol, *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269 (1988) (a differential tax case). Cases on export controls—though of less relevance here—provide further instruction for the simple proposition that the national market cannot be isolated for protectionist or local purposes. See, *e.g., Hughes* v. *Oklahoma*, 441 U. S. 322 (1979) (striking down a state law prohibiting the shipment of minnows out of State); *New England Power Co.* v. *New Hampshire*, 455 U. S. 331 (1982) (striking down a state law requiring the state utility commission's permission before a utility could convey electricity out of State).

In the only part of the Court's opinion that commands a majority the main point is that validation of Kentucky's tax exemption follows from the Court's opinion last Term in *United Haulers*. But that overlooks the argument that

was central to the entire holding of *United Haulers*. There the Court concluded the ordinance applied equally to interstate and in-state commerce—and so it applied without differentiation between in-state and out-of-state commerce—because the government had monopolized the waste processing industry. See *United Haulers*, 550 U. S., at ___ (slip op., at 1). Nondiscrimination, not just state involvement, was central to the rationale. That justification cannot be invoked here, for discrimination against out-of-state bonds is the whole purpose of the law in question. Kentucky has not monopolized the bond market or the municipal bond market. Kentucky has entered a competitive, nonmonopolized market and, to give its bonds a market advantage, has taxed out-of-state municipal bonds at a higher rate. The explicit rationale of the law is to differentiate between local and interstate commodities. This case is not an extension of *United Haulers;* it is a rejection of its principal rationale—that in monopolizing the local market, the ordinance applied equally to interstate and local commerce.

The Court's next argument is the police power argument, returning to the idea that revenue-raising is important for a State's own essential projects. See *ante*, at 11–12. This argument has two major flaws. First, it is a replay of the circularity inherent in the police powers, health, safety, and welfare rhetoric. It is difficult to think of any law meeting with general approval that, assuming its validity in other respects, would fall outside the description that it is for the health, safety, and welfare of its citizens. Second, the argument ignores the fact that all protectionist laws, by definition, can be justified to further some local interest.

In a case with important parallels to this one the Court considered whether a property tax exemption available to charitable and benevolent organizations in Maine could have differential application in order to advantage camps

that served primarily Maine residents as distinct from camps that served primarily out-of-state residents. See *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564 (1997). The Court was explicit in rejecting the argument that profit and not-for-profit organizations should be treated differently with respect to Commerce Clause protection, *id.,* at 584, despite the State's special, historic concern for charitable assistance within its own borders. The *Camps Newfound* analysis is applicable here: There is "no reason why the nonprofit character of an enterprise should exclude it from the coverage of either the affirmative or the negative aspect of the Commerce Clause." *Ibid.* So, too, there is no reason the governmental character of the bond-issuing enterprise should exclude it from the coverage of the Commerce Clause.

The majority concludes its central framework by saying the market for Kentucky's bonds is not similar to the market for private issuers because it is the Commonwealth's own discrete market. So, it says, Kentucky can discriminate if it chooses. Quite apart from the principle that discrimination in explicit terms, purpose, and effect should invalidate this law, the Court's argument proceeds, again, from a wrong and circular premise. The argument that Kentucky bonds are in a discrete market has no basis in the record. Kentucky state and local bonds compete with other bonds, as any investor knows. Within the national bond market there is a discrete submarket for all state and municipal bonds because they are tax exempt under the Internal Revenue Code. See *ante*, at 2 (citing 26 U. S. C. §103(a)). The Court, however, goes on to suggest that within this separate market there are 41 further discrete markets for bonds in each of the separate States that have laws like the one before the Court. *Ante*, at 12–13. This is wrong because it defines the market based upon sellers' purposes rather than upon its investors' purposes. The latter are the touchstone of market defini-

tion.  The Court's seller-based definition is at odds with our Commerce Clause jurisprudence.  The question has never been what the beneficiary of the discriminatory law will do with that benefit; that question relates to the ends sought by the discriminatory means.  See, *e.g., Bacchus*, 468 U. S., at 272–273; see also *United Haulers*, *supra*, at ___ (slip op., at 12–13) (ALITO, J., dissenting).

The issue in this case, then, cannot be resolved by determining what the issuer does with the proceeds.  And to the extent the Court says there is a consumer preference for a State's own bonds within its own borders, this makes the mistake of defining a market by first assuming the validity of the discriminatory law at issue.  No precedent permits the Court to define a market in terms of the very law under challenge for protectionist purposes and effects.  This double counting does not work.  If the discriminatory barrier did not exist, then the national market for all state and municipal bonds would operate like other free, nationwide markets.  The fact that the national market for tax-free state and municipal bonds is a discrete one serves only to reinforce the point that it should operate without local restriction.

That the people in each of 49 States that joined a brief in support of Kentucky are alleged to want the law is irrelevant.  See *ante*, at 21.  Protectionist interests always want the laws they pass, even if their fellow citizens bear the burden, for they are positioned to profit from the barrier.  The circumstance that the residents choose to bear the costs of a protectionist measure (assuming this to be so even though entrenched interests are the usual source for the law) has been found by this Court to be quite irrelevant: "This argument, if accepted, would undermine almost every discriminatory tax case.  State taxes are ordinarily paid by in-state businesses and consumers, yet if they discriminate against out-of-state products, they are unconstitutional."  *West Lynn*, 512 U. S., at 203; see

also *Bacchus, supra*, at 272.

That 41 States have local protectionist laws similar to this one proves the necessity of allowing settled principles against discrimination to operate in an important national market. The Court seems proud to say that New York was the first to enact a protectionist exemption. See *ante*, at 5. That, too, simply underscores the importance of adhering to the rules against state trade discrimination. New York, as a great financial capital, likely had no trouble raising money for its own bonds, and so its exemption might have been thought to be an advantage in some respects. The exemption benefits wealthy, high-tax States, allowing those States to hoard capital that otherwise might travel to issuers who offer a more competitive deal in pretax dollars. See, *e.g.,* Blumstein, Some Intersections of the Negative Commerce Clause and the New Federalism: The Case of Discriminatory State Income Tax Treatment of Out-of-State Tax-Exempt Bonds, 31 Vand. L. Rev. 473, 546 (1978).

In the wake of one trade barrier, retaliatory measures follow, as the Framers well knew. The widespread nature of these particular trade barriers illustrates the standard dynamics of politics and economics, demonstrating once more the need to avoid validating this law as somehow in the States' own interests. By misapplying the rationales of the controlling precedents, the Court invites further erosion of the Commerce Clause, which must remain as a deterrent to experiments designed to serve local interests at the expense of a national system.

The Court's categorical approach would seem to allow States to discriminate against out-of-state, government bonds in other ways. Nothing in the Court's rationale justifying this scheme would stop Kentucky from taxing interest on out-of-state bonds at a high rate, say 80%, simply to give its own bonds further advantage. High tax rates designed to make out-of-state interests less attrac-

tive are not unheard of in our cases. See, *e.g., Fulton*, 516 U. S., at 333. Today the Court upholds a scheme no different in kind from those patently unconstitutional schemes. Furthermore, the Court's approach would permit a State to condition tax-free treatment of out-of-state bonds on reciprocal treatment in another State, see *ante*, at 5–6, n. 7 (citing, for example, Utah's reciprocal tax-free treatment of States that do not tax Utah bonds), leading to the discrete market blocs the Constitution was designed to eliminate. These examples underscore the objections already noted.

## II

In a part of the opinion joined only by a plurality the analysis concludes the differential taxation scheme is a sufficiently diluted regulatory scheme so that the market-participant exception applies. See *ante*, at 14–19. This needs little comment. It suffices to note that a "tax exemption is not the sort of direct state involvement in the market that falls within the market-participation doctrine." *Camps Newfound*, 520 U. S., at 593. This expansion of the market-participant exception, if it were unleashed by a majority of the Court, would be an open invitation to enact these kinds of discriminatory laws— laws that, until today, the Court has not upheld in even a single instance. Taxation is a quintessential act of regulation, not market participation. See, *e.g., New Energy*, 486 U. S., at 278 ("[I]t [is] clear that Ohio's assessment and computation of its fuel sales tax, regardless of whether it produces a subsidy, cannot plausibly be analogized to the activity of a private purchaser"). And even in a case where a State is a paradigmatic market participant because it owns the asset itself, downstream restrictions that discriminate against interstate commerce are not permitted. See *South-Central Timber Development, Inc.* v. *Wunnicke*, 467 U. S. 82, 98 (1984) (plurality opinion) ("[A]lthough the

State may be a participant in the timber market, it is using its leverage in that market to exert a regulatory effect in the processing market, in which it is not a participant").

## III

Throughout the Court's argument is the concern that, were this law to be invalidated, the national market for bonds would be disrupted. See *ante*, at 23–27. The concern is legitimate, but if it is to be the controlling rationale the Court should cast its decision in those terms. The Court could say there needs to be a *sui generis* exception, noting that the interstate discrimination has been entrenched in many States and for a considerable time. That rationale would prompt my own statement of disagreement as a matter of principle and economic consequences, but it would be preferable to a decision that misinterprets the Court's precedents. Instead, today the Court weakens the preventative force of the Commerce Clause and invites other protectionist laws, thus risking further dislocations and market inefficiencies based on the origin of products and commodities that should be traded nationwide and without local trade barriers.

For these reasons, in my view, the judgment of the Court of Appeals of Kentucky should be affirmed.

# SUPREME COURT OF THE UNITED STATES

———

No. 06–666

———

## DEPARTMENT OF REVENUE OF KENTUCKY, ET AL., PETITIONERS *v.* GEORGE W. DAVIS ET UX.

ON WRIT OF CERTIORARI TO THE COURT OF APPEALS OF KENTUCKY

[May 19, 2008]

JUSTICE ALITO, dissenting.

I proceed in this case, as I did in *United Haulers Assn., Inc.* v. *Oneida-Herkimer Solid Waste Management Authority*, 550 U. S. \_\_\_, \_\_\_ (2007) (dissenting opinion), on the assumption that the Court's established dormant Commerce Clause precedents should be followed, and on that assumption, I entirely agree with and join JUSTICE KENNEDY's dissent.